IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Patricia A. Aurand,                          )
                                             )    Civil Action No. 6:07-3968-HMH-WMC
                      Plaintiff,             )
                                             )    **REPORT OF MAGISTRATE JUDGE**
          vs.                                )
                                             )
Michael J. Astrue,                           )
Commissioner of Social Security,             )
                                             )
                      Defendant.             )
_____)

This case is before the court for a report and recommendation pursuant to

Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this

District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3)

of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial

review of a final decision of the Commissioner of Social Security denying her claims for

disability insurance benefits and supplemental security income benefits under Titles II and

XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff protectively filed applications for disability insurance benefits

(DIB) and supplemental security income (SSI) benefits on January 25, 2005, alleging that

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined
to consent to disposition by the magistrate judge.

she became unable to work on December 10, 2003.[2] The applications were denied initially and on reconsideration by the Social Security Administration.  On January 9, 2006, the plaintiff requested a hearing.  The administrative law judge, before whom the plaintiff and her attorney appeared on January 25, 2007, considered the case *de novo*, and on April 20, 2007, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on October 26, 2007.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.
>
> (2)     The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b) and 416.920(b)).
>
> (3)     The claimant has the following severe impairments: fibromyalgia, knee pain, obesity, and depression (20 CFR 404.1520(c) and 416.920(c)).
>
> (4)     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> (5)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work that involves no more than unskilled or low semi-skilled tasks.
>
> (6)     The claimant is capable of performing past relevant work as a telemarketer.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

---

[2]The disability onset date was later amended to May 10, 2004.

2

(7)    The claimant has not been under a "disability," as defined in the Social Security Act, from December 10, 2003 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."   42 U.S.C. §423(a).   "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

3

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

4

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 42 years old as of May 10, 2004, the date she alleges she became disabled due to fibromyalgia, back pain, knee pain, depression and anxiety. She has a high school education with one year of business college, and worked in the past as a telemarketer and dietary aide.

The record showed a history of treatment in 2002 and 2003 by Rhonda Brown, FNP, a nurse practitioner for Dr. William Gamon at Inlet Medical Associates. During these visits, the plaintiff complained of fatigue, dizziness, panic attacks and myalgia (body pain). Examinations showed she was alert and oriented and had some tender trigger points, but retained a normal gait and full range of motion in all joints (Tr. 217-35).

The plaintiff was also treated in 2003 by Dr. C. Gregory Kang at the Pain, Spine & Sports Medicine Clinic, with complaints of fibromyalgia symptoms, left knee pain, and radiating back pain that was making it difficult to work. Examinations showed spinal tenderness but no neurological changes. Dr. Kang prescribed Methadone (narcotic pain medication) (Tr. 164-67).

By November 2003, the plaintiff reported that her medications were working very well in controlling her pain, but she still complained of fatigue and knee pain (Tr. 165). X-rays of the left knee showed "marginal" osteophytes (bony outgrowth or "spurs") with some associated joint space narrowing and "[m]inimal" spurs at the kneecap, with no joint effusion (fluid accumulation), fractures, dislocation or erosion. The radiologist diagnosed

5

"[o]steoarthritis most severe in the medial [inner side of the knee joint] compartment" (Tr. 135).

In January 2004, the plaintiff complained of body pain, difficulty with physical activity, and depression.  Examination showed her "usual" tender trigger points, and Dr. Kang diagnosed fibromyalgia, chronic depression and osteoarthritis of the left knee.  He prescribed Celebrex (nonsteroidal anti-inflammatory), Wellbutrin (anti-depressant), and Methadone (Tr. 163).  The following month, the plaintiff complained of body, back and knee pain, but said Methadone was working quite well and that she was not having to take as much as she used to take.  She also said that Wellbutrin was "definitely helping with depression" and that Celebrex seemed to be helping her knee pain.  She had tender trigger points on examination.  Dr. Kang decreased her Methadone dosage, changed her muscle relaxant, and continued her other medications (Tr. 162).

In March 2004, Dr. Kang injected the plaintiff's mid-back with a local anesthetic due to ongoing complaints of pain (Tr. 161), but she returned the next day saying it had not helped and that it was radiating into her chest (Tr. 160).  A few weeks later, about a month before her most recently alleged onset date, the plaintiff complained of neck, shoulder, low back and knee pain, but she said that her chest pain was significantly improved.  Dr. Kang noted she was tolerating Methadone well without any side effects, and examination showed her "usual" tender trigger points, but no neurological deficits.  Dr. Kang diagnosed fibromyalgia, osteoarthritis of the knee and lumbar spondylosis (degenerative changes).  He continued her medications and "encouraged her to try to return to some time of sedentary occupation" (Tr. 159).

In May 2004, the plaintiff reported "good pain control" with Methadone, which gave "her enough pain relief where she [could] function."  She also said that Celebrex was helpful for her arthritis symptoms and that she was "doing well" on Wellbutrin.  Examination showed spinal tenderness and limited range of motion with no swelling in the knees.  Dr.

Kang recommended that she "resume a more active lifestyle and hopefully get a job" (Tr. 158). That same day, Nurse Brown noted that the plaintiff had been having panic attacks. On examination, she appeared depressed, but was alert, fully oriented, and in no acute distress. She had a normal gait and full range of motion in all joints. She said she was looking for job with no lifting, but could not currently afford to see a counselor (Tr. 213-14).

In June 2004, the plaintiff again reported that her pain and depression were controlled on medications. Examination showed crepitus (popping sounds) in both knees, decreased range of motion of the lumbar spine, muscle spasms, and her usual tender trigger points. Dr. Kang concluded that she was "doing quite well," that her ability to function had improved, and that she should "return to work" (Tr. 157).

Between July and October 2004, the plaintiff was seen monthly by Constance Alger, FNP, Dr. Kang's nurse. Nurse Alger noted at various times that the plaintiff had spinal muscle tenderness, negative straight leg raise tests, full strength, and intact cranial nerves. She also indicated the plaintiff's medications were helping enough that she could do normal activities of daily living, and that she did not have any medication side effects (Tr. 153-56).

In November 2004, the plaintiff told Dr. Kang that she had continued pain, especially in her low back and left knee, and soft tissue pain over her spine. She said Methadone was providing partial temporary relief. Examination showed spinal tenderness and Dr. Kang concluded that he did not have "anything further to offer her" (Tr. 152).

Between December 2004 and March 2005, Nurse Alger oversaw the plaintiff's care and continued to note that her medications allowed her to do basic daily activities with no side effects (Tr. 149-51). In March 2005, Nurse Brown noted that the plaintiff was having financial difficulties and was "very depressed" (Tr. 210-11).

On March 31, 2005, the plaintiff presented to emergency care following a rear-end collision in her car. She complained of neck, sternum and left leg pain. On

7

examination, she had a normal gait; "slight[]" tenderness in the neck area, but no tenderness in her lumbar or thoracic spine; and full range of motion and no tenderness in her extremities, with the exception of her left leg, which appeared "atraumatic" and was "diffusely mildly tender." Her chest area was sore to touch, but there was no seatbelt mark (Tr. 138).

A CT scan of the cervical spine (neck) showed "mild" neuroforminal bony encroachment (narrowing of the opening in a vertebra where nerves exit the spinal canal) at C3-4 on the left, and from C3 to C7 on the right, with no specific malalignment or fracture (Tr. 131). Left leg x-rays showed "[m]ild to moderate" arthritic changes of the knee, a normally aligned hip, and no fractures (Tr. 132, 134). The physician noted the x-rays were "negative" and diagnosed a chest contusion, neck strain (pulled muscle), and left leg contusion (Tr. 138).

On April 21, 2005, the plaintiff presented to Dr. Karen Mahood for a consultative physical evaluation in connection with her application for benefits. The plaintiff told Dr. Mahood the Methadone she had been taking for the past year was controlling her fibromyalgia pain, but did not help her joint pain and arthritis (in her back, neck, knees, and hip). She said her left leg was the worst, that she used a cane to steady herself and that she could not work due to fatigue, but that she was able to drive, shower and dress herself, and button and unbutton her clothes. On examination, Dr. Mahood noted that the plaintiff was obese, and that she had normal deep tendon reflexes in all extremities, intact sensation, 4/5 muscle strength, and full range of motion in her spine and extremities with the exception of hip flexion. Straight leg raise testing (to detect possible nerve root irritation) was negative. The plaintiff was able to walk normally with a cane in her left hand, and could walk without the cane, although "quite antalgic and slow." Dr. Mahood also noted that the plaintiff "was able to sit comfortably without pain," but had pain in her joints with movement. She diagnosed fibromyalgia, arthritis and a cardiac murmur (Tr. 139-42).

8

In April and May 2005, Nurse Alger continued to note that the plaintiff's medications helped her pain and enabled her to perform activities of daily living, with no side effects (Tr. 147-48).

On June 3, 2005, a note from Dr. Kang's office indicated that the plaintiff had not complied with the "Random Pill Count and Urine Drug Screen" requirements of the clinic.  Following several unanswered messages regarding the tests from R. Jason McBee, the plaintiff's sister called back and claimed that they did not know how to get the messages off their phone, even though this was noted to be "untrue" since they had previously returned calls after messages left.  Eventually, the plaintiff and her sister came into the clinic for the urinary screen, but "informed [Mr. McBee] they had not brought the bottle for [plaintiff]" and that the plaintiff could not urinate.  The plaintiff's sister later returned with her medications for a pill count, and Mr. McBee noted that she had "skipped a month" of Methadone for financial reasons and was "a month ahead on medications since March, but that "[i]nstead of telling us she had meds, [she] continued to come in and get [prescriptions] in which [sic] she saved."  Mr. McBee informed them he needed bottles from the plaintiff and her sister at the same time to ensure a proper count for both.  The plaintiff then brought in a bottle dated April 2005 with only three pills, although Mr. McBee was able to confirm that she had gotten a new Methadone prescription on July 1, 2005.  When confronted, the plaintiff looked at her sister and claimed she had to leave because she was "very sick." The plaintiff and her sister did not return and were discharged from care (Tr. 146).

On June 14, 2005, the plaintiff presented to Jonathan Simons, Ph.D., a psychologist, for a consultative mental evaluation in connection with her application for benefits.  Dr. Simons noted that the plaintiff reported some depressive symptoms and took Wellbutrin and Xanax (anti-anxiety medication), but had never had formal mental health treatment.  The plaintiff told Dr. Simons that Xanax helped, and that she lived with her sister, cared for her personal needs, did some chores, fed her animals, drove, sometimes

9

socialized and had a few friends, and had problems with persistence and pace due to pain. On examination, she walked with a cane and had a sad and irritable mood, but "showed some range of affect and was able to smile and laugh appropriately at times."  She was oriented and appeared to have logical thinking, adequate judgment, average or above-average intelligence, and was able to adequately perform serial sevens (counting down from 100 by sevens, used to test concentration and memory).  Dr. Simons concluded that the plaintiff was capable of handling her own benefits and had the cognitive skills to work in semi-skilled to skilled work settings.  He noted that her physical problems were outside the scope of his examination.  He further noted that "[h]er pain itself [could] not be considered as a psychological block to her ability to work," that her "depression itself [wa]s not disabling," and that she would be only "mildly depressed if she was healthier."  He diagnosed a pain disorder with both psychological factors and a general medical condition, and a GAF of 65 to 70[3] (Tr. 143-45).

Later that same month, the plaintiff told Nurse Brown that her pain made it difficult to get around and that she was no longer seeing Dr. Kang.  She also stated that she was stressed about financial difficulties.  On examination, she appeared depressed and had limited range of motion in her joints.  Nurse Brown noted that the plaintiff needed follow-up for pain control and that she refused lab work because she did not have insurance (Tr. 208-09).

In July 2005, pelvic x-rays showed "mild" enlargement of the lumbosacral [low back] facet joints (Tr. 168), and lumbar spine x-rays showed "[m]ild" lower lumbar degenerative changes with some overgrowth (Tr. 170).    Left knee x-rays showed

---

[3]A GAF score of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *See Diagnostic and Statistical Manual - Text Revision* (2000) (DSM-IV-TR), *available on* Stat!Ref Library Cd-ROM (2nd Qtr. 2008).

compartment narrowing more prominent on the medial side with "marginal" spurring, and "mild" narrowing of the patellofemoral compartment (front of the knee) with some spurring (Tr. 169).

On October 5, 2005, the plaintiff told Nurse Brown she had fallen on her left knee a month prior and needed her medications refilled. On examination, she was alert and oriented, and had painful left knee movements with limited range of motion, but the knee joint was not unstable and there was no crepitus or fractures. Nurse Brown prescribed Lyrica (fibromyalgia medication) and continued her Ultram (narcotic pain medication) and Xanax (Tr. 204-05).

On January 10, 2006, Nurse Brown completed a form, which was also signed by Dr. Gamon, indicating that the plaintiff had "severe" pain that caused "marked" restrictions in activities of daily living and social functioning, and deficiencies in concentration, persistence and pace that resulted in frequent failure to complete tasks in a timely manner (Tr. 242-43). Two months later, Nurse Brown completed a form indicating the plaintiff had mostly "marked" and "extreme" mental limitations due to her history of panic attacks, social anxiety disorder, and worsening depression and anxiety (Tr. 244-46).

On January 10, 2007, a few days before the administrative hearing, the plaintiff told Nurse Brown her knee pain was getting worse and that she had continued back pain. She said she could not extend her knee or bend to pick up anything or stand more than 10 minutes, and had difficulty with stairs. She said her anxiety and depression was worse some days, and that she slept only a few hours a night. Examination showed she was oriented and in no acute distress, had pain and limited range of motion in her spine and left knee, and appeared to move around in her chair to try to get comfortable. Nurse Brown diagnosed lower leg joint pain; thoracic or lumbosacral neuritis (nerve inflammation) or radiculitis (nerve root inflammation); and fibromyalgia. She provided Lidoderm pain patches, noting that current medications were not completely relieving her pain (Tr. 201-03).

11

Nurse Brown also completed several forms, signed off by Dr. Gamon.  Overall, she indicated that the plaintiff could *never* lift any weight, stand, sit, bend, stoop, or climb ladders.  She also noted that the plaintiff used a cane to ambulate, used a walker to get in and out of bed, had difficulty climbing stairs, and needed to change positions frequently (Tr. 236-41).

At the hearing in January 2007, the plaintiff testified that she was 5'4" and weighed 290 pounds.  She said that her weight had fluctuated since 1990, when she had a thyroid goiter removed.  She said she had problems with her hands and dropped things for the past two years (Tr. 27-28).  She said that her pain clinic had "made it impossible for [her] to come back," and that she could not afford it (Tr. 28).  She said she had not driven for "about a year and eight months" due to knee and spine pain, and that stairs were very painful for her (Tr. 29-30).  She said she had severe arthritis in her knee and burning on the bottoms of her feet since 2001 (Tr. 31-32).  She said she could bathe herself but needed assistance getting out of the shower and getting dressed due to knee pain.  She said she spent her days watching television, reading, and taking naps (Tr. 33).  She said her sister did the cooking and that she did not visit with friends, attend church or do outdoor chores (Tr. 33-34).  She said she used a prescribed cane.  She said she could stand only 30 seconds without leaning on the wall, needed to change positions every five minutes, and could walk only 30 feet (Tr. 34).  She said she did not sleep well and took two naps a day (Tr. 34-35).  She said she could not afford further diagnostic testing for her physical impairments (arthritis in the spine and knees, spurs on her spine, and burning in her feet) and had been taking medication for depression and anxiety since 2001 (Tr. 35-36).  She said she primarily saw Nurse Brown and that Dr. Gamon merely oversaw her and signed for medications (Tr. 35).  She said her medications made her tired (Tr. 36).  She said she last worked in December 2003 for a travel service, surveying vacationers over the telephone (Tr. 30).  She said the job required sitting "most of the day" and did not require significant

12

standing or walking.  She said she had missed a lot of work due to pain and fatigue, and had difficulty concentrating at the time she left that job (Tr. 31).  She said she could not do any of her past work due to concentration problems, an inability to sit in one position for prolonged periods, and an inability to walk (Tr. 32).

Following the ALJ's decision, on May 7, 2007, at the request of the plaintiff's attorney, vocational specialist Dixon Pearsall, Ph.D., interviewed the plaintiff and concluded she was "not competitively employable on a full-time basis at any exertion or skill level" (Tr. 252-57).[4]

## ANALYSIS

The plaintiff has a high school education and one year of business college, and has past relevant work experience as a telemarketer and dietary aide.  She alleges that she became disabled on May 10, 2004, due to fibromyalgia, hypothyroidism, osteoarthritis, lumbar spondylosis, and severe anxiety/depression with panic attacks (Tr. 17, 94, 243).  The plaintiff was 42 years old on her alleged onset date.  The ALJ found that the plaintiff had the following severe impairments:  fibromyalgia, knee pain, obesity, and depression and retained the residual functional capacity ("RFC") to perform sedentary work that involves no more than unskilled to low semi-skilled tasks (Tr. 20).  The ALJ further found that the plaintiff could perform her past relevant work as a telemarketer.  The plaintiff argues that the ALJ erred by (1) failing to consider all of her severe impairments and whether her combined impairments were disabling; (2) failing to consider the complete record in assessing her residual functional capacity; (3) failing to properly consider the opinion of her treating physician; and (4) failing to properly assess her mental impairments.

---

[4]This evidence was before the Appeals Council when it made its determination.

13

### *Combined Impairments*

The plaintiff first argues that the ALJ failed to consider her low back and cervical impairments, anxiety, panic disorder, and the side effects of her medications.  In a disability case, the combined effect of all a claimant's impairments must be considered without regard to whether any such impairment, if considered separately, would be sufficiently disabling.  Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'"  *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974).  The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity.  *Id.*  The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed.  *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

The ALJ found that while her fibromyalgia, knee pain, obesity, and depression affected her ability to work, the plaintiff did not have functional limitations so severe as to preclude her from performing the demands of unskilled to low semi-skilled sedentary work.  In discussing the plaintiff's fibromyalgia, the ALJ noted that the plaintiff received little treatment for fibromyalgia, but was primarily examined for knee complaints and back pain.  The ALJ stated that the medical evidence showed that the plaintiff's knee arthritis was no more than mild to moderate in severity, and x-rays of her back showed only mild lower lumbar degenerative changes (Tr. 21, 23, 131, 168, 170).  However, the ALJ failed to discuss other medical evidence showing that her treating doctor indicated that the plaintiff had lumbar radiculopathy (Tr. 237, 243), and indicated that she required a cane to ambulate (Tr. 203, 240).  The plaintiff took narcotic pain medication in part due to her back condition, obtained epidural injections, and was noted to have muscle spasms, decreased motor

14

strength, and limited range of motion in her back on several occasions (Tr. 140, 152, 157, 160, 167, 202, 220).  Upon remand, the ALJ should be instructed to consider this evidence.

The plaintiff also argues that the ALJ failed to properly consider her anxiety and panic disorder in combination with her other impairments.  The defendant argues that the ALJ's consideration of the plaintiff's anxiety was subsumed into his analysis of her depression.  Although the ALJ did mention in passing that the plaintiff had received treatment for depression and anxiety in 2001, he did not discuss the plaintiff's continuing anxiety with panic attacks despite being on anti-anxiety medication (Tr. 201, 202, 213, 219, 243, 246).  As pointed out by the plaintiff, the plaintiff's past work involved dealing with the public essentially all day.  Upon remand, the ALJ should be instructed to consider the medical evidence regarding the plaintiff's anxiety disorder with panic attacks and provide rationale for dismissing it as a severe impairment.

The plaintiff argues that the ALJ failed to properly consider the side effects of her medications in combination with her other impairments.  The defendant argues such analysis is unnecessary because treatment notes show that the plaintiff's medications were not causing any side effects.  However, there is some evidence that the methadone, which was used to control her fibromyalgia pain, did contribute to the plaintiff's fatigue (Tr. 141, 217, 224).  Upon remand, the ALJ should be instructed to consider this evidence.

Upon remand, after considering the above evidence, the ALJ should specify his reasons for finding such impairments to be non-severe.  Whether or not the impairments are found to be severe, the ALJ should consider all of the plaintiff's impairments in combination in determining the plaintiff's RFC.

### *Residual Functional Capacity*

The plaintiff next argues that the ALJ failed to accurately assess the medical evidence with regard to the impairments that he did consider.  Specifically, the plaintiff

15

notes that while the ALJ found the plaintiff's fibromyalgia to be a severe impairment, he rejected the plaintiff's allegations as to the severity of her fibromyalgia because the plaintiff was only given Ultram, a mild pain reliever, and "treatment notes fail to mention any findings regarding trigger points or any neurological deficits" (Tr. 21). As pointed out by the plaintiff, the medical records indicate the plaintiff was treated with a number of medications for fibromyalgia, including narcotic medications, and the records repeatedly refer to the plaintiff's multiple trigger points on evaluation (Tr. 157-63). The defendant acknowledges these errors in the ALJ's decision but argues that it is harmless error. This court disagrees.

The plaintiff further contends that the ALJ did not consider all the medical evidence in regard to her knee impairment. Specifically, the plaintiff contends that the ALJ mischaracterized x-rays of her knee as showing only "mild to moderate arthritic changes." In support of her argument, the plaintiff points to an x-ray report from 2003 that describes findings of "marginal osteophytes at the medial femoral condyle and medial tibial plateau" and "minimal spurs of the patella" (Tr. 135). The impression portion of the report states "osteoarthritis most severe in the medial compartment as described" (Tr. 135). In December 2003, Dr. Kang described the plaintiff's x-rays as revealing "severe medial compartment arthritis" (Tr. 164). Later x-rays taken during the period at issue showed "mild to moderate" changes as the ALJ stated (Tr. 132, 134, 169).

Based upon the foregoing, upon remand, the ALJ should be instructed to consider all of the medical evidence, including the foregoing evidence regarding the plaintiff's fibromyalgia and knee pain, in making the RFC determination.

### Treating Physician

The plaintiff also argues that the ALJ misread the medical evidence and thus erred in his rationale rejecting the opinion of her treating physician. On January 10, 2006, Nurse Brown completed a form, which was also signed by Dr. Gamon, indicating that the

16

plaintiff had "severe" pain that caused "marked" restrictions in activities of daily living and social functioning, and deficiencies in concentration, persistence and pace that resulted in frequent failure to complete tasks in a timely manner (Tr. 242-43). Two months later, Nurse Brown completed a form indicating the plaintiff had mostly "marked" and "extreme" mental limitations due to her history of panic attacks, social anxiety disorder, and worsening depression and anxiety (Tr. 244-46).

The plaintiff argues that the ALJ rejected her treating physician's opinion (presumably that of Dr. Gamon) based on a misreading of the evidence. The alleged misreading of the evidence is described and addressed above. The ALJ stated in his opinion that he considered Dr. Gamon's opinions, but he gave the opinions "absolutely no weight." The ALJ noted that forms were "not supported, in the least, by the evidence of record as a whole." The ALJ further stated:

> Dr. [Gamon] and Ms. Brown indicated that the claimant was limited to standing "none" and sitting "none" due to her knee pain and she could stand no more than 15 minutes at one time due to pain in her back. If these limitations were accurate, the claimant would be a complete invalid and in bed 24 hours a day, which is clearly not the case. Further, as noted above, x-rays of the claimant's left knee show she has only mild to moderate arthritic changes and x-rays of her spine show only mild degenerative changes. Dr. [Gamon] and Ms. Brown also indicated that the claimant was suffering from severe depression and that she had marked to extreme limitations in functioning. This assessment is also inconsistent with the evidence of record. As noted above, Dr. Simons found the claimant's depressive symptoms were not disabling. In addition, the claimant did not even mention any specific depressive symptoms during her testimony at the hearing. Surely if her depression was as severe as Dr. [Gamon] and Ms. Brown attested to, the claimant would have mentioned the symptoms during her testimony. In light of all the above, no weight has been given to Dr. [Gamon]'s and Ms. Brown's opinions . . . .

(Tr. 22).

17

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest

18

weight and should be adopted, even if it does not meet the test
for controlling weight.

*Id.* 1996 WL 374188, *4.

As described above, the ALJ in this case failed to consider all of the plaintiff's impairments in combination and failed to consider certain evidence with regard to the plaintiff's fibromyalgia and knee pain. Accordingly, upon remand, the ALJ should be instructed to reconsider Dr. Gamon's opinion in accordance with the above law and in light of all the evidence of record.

### Mental Impairments

Lastly, the plaintiff argues that the ALJ failed to properly assess her mental impairments in the manner required by the Code of Federal Regulations ("CFR"). The ALJ found that, as a result of her depression, the plaintiff:

> ... would have mild restriction of activities of daily living, she
> would have mild difficulties maintaining social functioning, she
> would have moderate difficulties maintaining concentration,
> persistence or pace performing detailed tasks but mild
> difficulties performing simple to low semi-skilled tasks, and she
> has never had episodes of decompensation.

(Tr. 22).

The plaintiff argues specifically that while the ALJ did make the required function by function assessment, he overlooked her anxiety disorder as an impairment. *See* 20 C.F.R. §§ 404.1520a.[5] This court agrees as discussed above. Further, the plaintiff

---

[5]This regulation provides in pertinent part:

> (c)(3) We have identified four broad functional areas in which we will
> rate the degree of your functional limitation: Activities of daily living;
> social functioning; concentration, persistence, or pace; and episodes
> of decompensation. See 12.00C of the Listing of Impairments.
> (4) When we rate the degree of limitation in the first three functional
> areas (activities of daily living; social functioning; and concentration,
> persistence, or pace), we will use the following five-point scale: None,

(continued...)

19

notes that in the "concentration, persistence, or pace" category, the ALJ made separate findings regarding the degree of restriction for detailed tasks and "low semi-skilled" tasks. This finding allowed the ALJ to conclude that the plaintiff, despite her mental impairments, could return to her past semi-skilled work as a telemarketer.  As argued by the plaintiff, it is not clear whether the federal regulations allow the ALJ to classify the plaintiff's mental impairment in regards to concentration, persistence, or pace in this fashion.

Lastly, the plaintiff contends vocational expert testimony was required because her severe mental impairments represent a significant non-exertional impairment. The defendant counters that while the regulations allow an ALJ to use the services of a vocational expert to determine whether a claimant could perform her past relevant work at step four, an ALJ is not *required* to do so.  *See* 20 C.F.R. § 404.1560(b)(2).[6]

---

[5](...continued)

mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.
***
(e)(2) At the administrative law judge hearing and Appeals Council levels, and at the Federal reviewing official, administrative law judge, and the Decision Review Board levels in claims adjudicated under the procedures in part 405 of this chapter, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(c), (e).

[6]This regulation provides in pertinent part:

(b)(2) Determining whether you can do your past relevant work. We will ask you for information about work you have done in the past. We may also ask other people who know about your work. (See § 404.1565(b).) We may use the services of vocational experts or vocational specialists, or other resources, such as the "Dictionary of

(continued...)

Based upon the foregoing, it appears to this court that vocational expert testimony would be helpful in this case in the determination of whether the plaintiff could return to her past relevant work at step four of the sequential evaluation process. Accordingly, upon remand, the ALJ should be instructed to obtain such testimony.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

January 22, 2009

Greenville, South Carolina

---

[6](...continued)
Occupational Titles" and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity. A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy. Such evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work. In addition, a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

20 C.F.R. § 404.1560(b)(2).